**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Richmond Division**

**Tasmia Moulvi,** *on behalf of herself*
*and all individuals similarly situated*,

      **Plaintiff,**

**v.**                                          **Civil Action No.**  3:20cv595

**Safety Holdings, Inc.,**

**HireRight, LLC,**

**and**

**RICHARD D. HOLCOMB,**
**in his official capacity as the Commissioner**
**of the VIRGINIA DEPARTMENT OF**
**MOTOR VEHICLES,**

      **Defendants.**

<u>**CLASS ACTION COMPLAINT**</u>

      COMES NOW Plaintiff, Tasmia Moulvi, ("Plaintiff"), by counsel, and for her Class Action

Complaint against Defendants, she alleges as follows:

**INTRODUCTION**

      1.    Plaintiff brings this Class Action Complaint against two large national consumer

reporting agencies, Defendants Safety Holdings, Inc. and HireRight, LLC,  due to their mutual

failures to follow reasonable procedures to assure the maximum possible accuracy of records that

each acquired and republished from the Virginia Department of Motor Vehicles relating to the

Plaintiff, as required by the federal Fair Credit Reporting Act.  Regarding Plaintiff, Defendants

sold and furnished information regarding expunged records. Plaintiff brings an additional class

claim against Safety Holdings for failing to provide her with notice of the publication of adverse

public record information about her "at the time" that it sold those records, or in the alternative, for failing to maintain strict procedures to ensure that the information sold about her was both "complete" and "up to date". She also alleges on an individual basis that Defendant Safety Holdings violated the Driver Privacy Protection Act of 1994 when it accessed her records from the VA DMV for use in connection with a matter that did not involve "matters of motor vehicle or driver safety" and in the absence of "written consent" provided by Plaintiff to Defendant Safety Holdings to obtain such information.

2.      And finally, she brings an individual claim for declaratory relief against the Virginia Department of Motor Vehicles to obtain a judicial declaration that the "Driver Record Information" report sold about her on August 3, 2018 was provided to Defendant Safety Holdings in violation of Virginia law; and for injunctive relief to enjoin it from (a.) including records from other jurisdictions that are not related to convictions relating to her use of a motor vehicle when it furnishes "Driving Record Information" reports about her in the future, and (b.) that such information only be furnished about her when the position that she is being considered for involves the operation of a motor vehicle as required by Virginia Code § 46.2-208(B)(11).

**PARTIES**

3.      Ms. Moulvi is a natural person, a resident of the Commonwealth of Virginia, is a "consumer" as defined by the Fair Credit Reporting Act at 15 U.S.C. § 1681a(c), and is a "person" and was the subject of "personal information" as defined by the Driver Privacy Protection Act at 18 U.S.C. § 2725(2) and (3), and by Virginia Code § 2.2-3801.

4.      Defendant Richard D. Holcomb is the Commissioner of the Virginia Department of Motor Vehicles (hereafter "VA DMV"). Mr. Holcomb is sued in his official capacity as Commissioner of the DMV.

5.     As Commissioner of the DMV, Mr. Holcomb is the chief executive officer responsible for the supervision and management of the DMV and has authority to do all acts necessary or convenient to carry out the powers and duties of the DMV. Va. Code Ann. §§ 46.2-200-224.

6.     The Virginia Department of Motor Vehicles ("VA DMV") is based in Richmond, Virginia and maintains "driver information" related to residents of the Commonwealth, defined by statute as only that information that "relates to driver's license status and driver activity". VA DMV gathers, maintains and disseminate information relating to Virginia drivers or other persons who are convicted of moving violations in the Commonwealth.

7.     Safety Holdings, Inc., doing business as "Samba Safety" (hereafter "SAMBA") is a foreign corporation that gathers, holds and disseminates information for driving records of individuals directly to companies or to third party companies.  Defendant SAMBA purports to "Transform data into action to protect businesses and communities from driver and mobility risk" and claims to be "the pioneer and leading North American provider of cloud-based mobility risk management software solutions for organizations with commercial and non-commercial drivers."

8.     HireRight, Inc. (hereafter "HireRight") is a foreign corporation that purports to be "one of the leading screening services companies. . . [with] a powerful spectrum of background check solutions that span the globe. . . and makes you look good to your candidates with an award-winning candidate experience."  Defendant HireRight purports to "get it right every time, everywhere" and as a "Key Innovation," Defendant HireRight purports to have "developed the industry's first Internet-based background screening solution and launched it in June 1997. HireRight claims to have been the first to develop pre-integrated background screening solutions with leading e-recruiting applications, and, following its acquisition of the other industry

powerhouse General Information Services in 2018, now allegedly offers more of these solutions than any provider in the industry.

## JURISDICTION

9.      The Court has jurisdiction under 15 U.S.C. § 1681p and 28 U.S.C. § 1331.

10.     Venue is proper in this Court under 28 U.S.C. § 1391(b) as a substantial part of the events giving rise to the claim occurred in this judicial district.

## FACTUAL ALLEGATIONS AND BACKGROUND

### Background on the Shared Data

11.     The VA DMV maintains driver records in a centralized database and provides an abstract or transcript of a driver's records upon request, but only to certain authorized persons.

12.     Due to the sensitive nature of the information maintained by the VA DMV, the release of such records is governed by many statutes including Va. Code § 46.2-208 and the Driver Privacy Protection Act of 1994, 18 U.S.C. § 2721, *et seq.* ("DPPA").

13.     In addition, the transfer of information by the VA DMV to third parties is made pursuant to and therefore must be in compliance with the "Driver License Agreement" ("DLA").

14.     The DLA is an interstate compact between all but 3 states and written with the assistance of the American Association of Motor Vehicle Administrators (AAMVA). The DLA requires all states to honor licenses issued by other member states, report traffic convictions to the licensing state, prohibit a member state from confiscating an out-of-state driver's license or jailing an out-of-state driver for a minor violation; and maintain a complete driver's history, including withdrawals and traffic convictions.

15.     The DLA allows other jurisdictions to access motor vehicle records, in accordance with the DPPA, and to transfer the driver's history if the driver transfers his license.

16.    The DLA agreement allows states to share information relating to drivers, but is specifically limited to ***convictions***.

17.    The precursor, Driver's License Compact was ratified the Driver's License Compact at § 46-283 et seq. of the Code of Virginia and defines the included convictions as "offense[s] relating to the use or operation of a motor vehicle, and license suspensions or revocations." Va. Code § 46.2-483.

18.    The DLA is coordinated through the AAMVA.

19.    Commissioner Holcomb is one of the seven Board Members of the AAMVA.

20.    Due to differences in elements of driving offenses, names, and statutory structures between different states, the AAMVA developed a system using standardized categories of offenses by which to transfer information between jurisdictions so that such information can be used for purposes of driver licensing, fine collection, administrative driver suspensions and other actions.   The shorthand codes used to identify a specific driving conviction are defined in AAMVA's Code Dictionary and referenced as "ACD Codes".

21.    Whenever a driving related conviction occurs, offenses are assigned ACD Codes by the reporting state and transmitted to the national database known as the National Driver Register, where it can then by queried by the issuing state, for example, when determining whether to renew a license, or any other state when determining whether to issue a new license to that individual for the first time.

22.    The    AAMVA    Code    Dictionary    is    publicly    available    at https://www.aamva.org/ACD/ and thus would have been known to SAMBA and HireRight.

23.    Whenever a driving related conviction occurs, offenses are assigned ACD Codes by the reporting state and transmitted to the national database known as the National Driver Register, where it can then by queried by the issuing state, for example, when determining whether to renew a license, or any other state when determining whether to issue a new license to that individual for the first time.

## Facts as to Plaintiff

24.    In August 2012, Ms. Moulvi, a Virginia resident, enrolled at Ohio State University where she attended college for four years.

25.    On April 6, 2014, Ms. Moulvi was stopped and issued misdemeanor summonses to be heard in the Franklin County Ohio Municipal Court for (1) Prohibited Acts, in violation of § 4507.30(A) of the Ohio Revised Code relating to her alleged possession of a fictitious Florida driver's license ("the fictitious identification charge") and (2) Offenses Involving Underage Persons in violation of § 4301.69(E)(1) of the Ohio Revised Code, relating to her allegedly being under the influence of alcohol in a public place while underage ("the drunk in public while underage charge"), (together hereafter, "the Ohio Offenses").

26.    Neither of the Ohio Offenses are driving related convictions.

27.    Ms. Moulvi was distraught about the charges.  She was living in scholarship housing and her entire college career was put at risk.

28.    She hired counsel and on September 24, 2014, the "drunk in public while underage charge" was dismissed and the possession of a fictitious driver's license charge was amended to Disorderly Conduct in violation of § 2917.11(E) of the Ohio Revised Code which is a misdemeanor of the fourth degree.  Ms. Moulvi pleaded guilty to the amended charge and was ordered to pay court costs.

29.     Disorderly conduct as defined at § 2917.11(E) of the Ohio Revised Code is not a driving relating conviction.

30.     In 2016, Ms. Moulvi graduated with a Bachelor of Science and a major in Environmental Science and began a career in government contracting in the Washington, D.C. Metropolitan Area.

31.     Ms. Moulvi's intended career as a government contractor or employee was expected to involve the handling of sensitive government information and, therefore, would almost certainly require her to obtain and maintain a security clearance issued by the Federal Government.

32.     Ms. Moulvi deeply regretted the incident that occurred while she was in college, and given that she was a new graduate about to start her life in government service, she was also concerned about the continued existence of the Ohio Offenses in the public record, in that they might cause issues with her background check during the hiring process.

33.     In 2016, Ms. Moulvi hired counsel and filed a request with the Franklin County Municipal Court sealing from private use of all records relating to the Ohio Offenses.

34.     Ohio Rev. Code Ann. § 2953.32 was enacted for the very circumstances at issue here.  Assuming no other bad conduct, after one year, a person with a misdemeanor conviction may go back to the same court and obtain an order to "seal" such prior conviction.

*35.*     Ohio Rev. Code Ann. § 2953.32 is not merely an expungement or a hiding of the record.  Instead, the law provides that (a.) "the court shall order all official records of the case that pertain to the conviction sealed" and (b.) *"all index references to the case that pertain to the* conviction … deleted."  Importantly, "[t]The proceedings in the case that pertain to the conviction … *shall be considered not to have occurred*." (Italics added).

36.     On March 15, 2017, Judge Morehart of the Franklin County Municipal Court entered an order explicitly finding that Ms. Moulvi was eligible under § 2953.32, had no pending criminal proceedings, was rehabilitated, and that there were no legitimate government need to maintain the records of the Ohio Offenses as accessible public records or as a conviction.

37.     On that day and upon entry of the Order, as per § 2953.32 of the Ohio Revised Code the records of the Ohio Offenses were sealed and are currently no longer part of the accessible public record in Ohio.

38.     As a matter of law, the Plaintiffs' previous convictions are to "be considered not to have occurred."

39.     Section 19.2-392.4 of the Code of Virginia prohibits all employers from asking about expunged charges and provides that a job applicant does not have to disclose arrests or charges that are expunged.  *See* VA CODE ANN. § 19.2-392.4.

40.     Ms. Moulvi was relieved as she thought she would never have to talk about the Ohio Offenses ever again and that they were behind her for good.

41.     In July, 2018, Ms. Moulvi applied for a position with Iron Bow Technologies LLC ("Iron Bow") as a project manager.

42.     On July 10, 2018, she spoke with a recruiter and she thereafter conducted in-person interviews on July 16, 2018 and July 18, 2018.

43.     She was given a verbal offer over the phone and she completed a written job application on July 24, 2018.

44.     Consistent with the Ohio court's entry of a § 2953.32 Order, Ms. Moulvi stated that she did not have any criminal convictions.

45.    On August 1, 2018, Iron Bow sent Ms. Moulvi a written offer contingent upon successful completion of a criminal background check.

46.    On August 3, 2018, Iron Bow submitted a request to purchase a "Standard Background Check" from Defendant HireRight regarding Ms. Moulvi.

47.    On August 3, 2018, HireRight received a request for a "Standard Background Check" from Julia Hall, an employee of Iron Bow.

48.    HireRight proceeded to confirm Ms. Moulvi's educational credentials from Ohio State, her prior employment with various employers, her social security number, and confirmed her references.

49.    HireRight also checked Ms. Moulvi's criminal history and the sex offender registries.

50.    HireRight contacted Franklin County, Ohio and determined that there was "No Court Record Found."

51.    HireRight contacted Fairfax County, Virginia and determined that there was "No Court Record Found."

52.    HireRight contacted the U.S. District Courts for the Eastern District of Virginia and Southern District of Ohio and determined that there was "No Record Found."

**Defendant SAMBA's and VA DMV's Conduct**

53.    HireRight also includes DMV records in its employment background reports.

54.    HireRight purchases those DMV records, including VA DMV records, from SAMBA, with whom it had a resale contract.

55.    In order to obtain Ms. Moulvi's "Motor Vehicle Record," HireRight submitted a request to Defendant SAMBA.

56.    HireRight could have requested Plaintiff's records directly from the VA DMV.

57.    In doing so, Defendant HireRight directed Defendant SAMBA to obtain Ms. Moulvi's Driving Record Information report.

58.    At that time, Plaintiff had no knowledge of Defendant SAMBA and had never consented for it to access any of her protected information.

59.    Defendant SAMBA submitted a request to the VA DMV for Ms. Moulvi's 11-year Driver Transcript pursuant to its standing agreement with the VA DMV.

60.    Upon information and belief, the VA DMV sold information on the expunged Ohio Offenses. These records are not reportable under the DLA, which governs the reporting of driving related records.

61.    SAMBA knew and knows about the VA DMV's use of the DLA ACD Codes.

62.    Despite knowing that only "offense[s] relating to the use or operation of a motor vehicle, and license suspensions or revocations" are reportable via the DLA, Defendant SAMBA obtained and used the records provided by the VA DMV, but then assigned its own private 's codes, which it titles "AVD Codes."

63.    Defendant SAMBRA provided the following erroneous information regarding Plaintiff to Defendant HireRight:

a.    A "Violation" on April 6, 2014 and a "Conviction" on September 24, 2014 for "Fraud App for Lic-Misdemeanor" in Ohio, assigning it a D002 ACD Code and a DB21 AVD Code;

b.    Two separate "Violations/Convictions    Failures to Appear    Accidents" resulting in "**ACCIDENT**" in Fairfax County in 2015 and 2016, assigning both an AA01 AVD Code; and

c.     A license revocation for "FALSE AFFIDAVIT" that was "ordered" and effective on October 9, 2014 that had a September 23, 2015 "CLR/DATE" and September 23, 2018 "END/DATE", assigning it an DA06 AVD Code.

64.    None of this information was true.  All of this reporting was inaccurate.

65.    Ms. Moulvi was never charged or convicted of submitting a fraudulent application to obtain a driver's license.

66.    Ms. Moulvi was never charged with a traffic violation as a result of any accident she was involved in.

67.    Ms. Moulvi never submitted a false affidavit to anyone.

68.    All of this inaccurate information was defamatory on its face as (1) all of the offenses were ordered "considered not to have occurred" and sealed, (2) the Ohio Offense was simply for Disorderly Conduct and was not anything related to the operation of any motor vehicle, (3) none of the accidents resulted in violations, and (4) Ms. Moulvi's administrative license suspension issued in Virginia ended on September 15, 2015 and not September 23, 2018 (which was the date her monitoring for financial responsibility terminated).

69.    Even assuming that the fictitious identification charge that was amended to Disorderly Conduct was reportable – which is was not - the D02 ACD Code assigned by SAMBA stands for "*Misrepresentation of identity or other facts on application, including required self-certifications for non-commercial permit or license*" and is obviously a much more serious offense than the Plaintiff's charge.

70.    The D02 ACD code, for example, would apply to someone that went into a Motor Vehicle Agency office and submitted a false application to the Commonwealth using someone else's personal identifiers in order to obtain a new driver's license in their name.

71.    The VA DMV also told Defendant SAMBA that Ms. Moulvi's administrative suspension originated from an Ohio offense, but Defendant SAMBA's report did not repeat that information.

72.    Additionally, nothing in Defendant SAMBA's report indicated where any of its information originated. Thus, Defendant SAMBA's report was materially incomplete.

73.    Further, nothing in Defendant SAMBA's report indicated that the Ohio records were expunged, further rendering its reporting inaccurate and outdated.

74.    Defendant SAMBA substituted its own algorithm and "logic" to replace the information from the VA DMV, with its own odes, which it had no authorization to access in the first place.

## Defendant SAMBA's Processing of Motor Vehicle Records

75.    Defendant SAMBA purports to be a pioneer and leading provider of driver risk management software in North America for providers who need information relating to an individual's driving records, such as insurance companies underwriting insurance policies and employers conducting background checks on potential applicants.

76.    Defendant SAMBA has entered into agreements with AAMVA members across the entire United States to have on demand access to driver's records upon request.  Defendant SAMBA claims that it "communicates with contacts at individual departments of motor vehicles, courts, and other data sources to learn how each jurisdiction presents its motor vehicle records ("MVR") information."

77.    Over the last 20 years, Defendant SAMBA developed a system to distill raw information from different motor vehicle administrators' records from every jurisdiction in the United States and Canada which it purports to "distill, categorize, and enhance that data, so that it

can present the data in a unified, user-friendly format" and that its customers, such as Defendant Hire Right, can then use that platform for their business purposes, such as conducting background checks (the "SAMBA Platform").    Defendant SAMBA also claims "[a]s Data Sources evolve and change the format and content of the information they provide, [Defendant] SAMBA adjusts and updates the SAMBA Platform to deal with those changes."

78.    As part of its effort to create a "unified, user-friendly format" or "uniform, accurate, and understandable" format "that its customers can meaningfully review," Defendant SAMBA has "invented" its own set of codes to enable users to compare and analyze driving records across jurisdictions that are similar to the ACD codes, but "far more comprehensive."   Defendant SAMBA claims that ACD Codes "do not support the specificity and granularity of information required by many of [Defendant] SAMBA's customers."  It has published its coding system as its "ADR Violation Dictionary" otherwise known as "AVD Codes."

79.    Defendant SAMBA's AVD Code decisions are a function of certain inferences, categorizations, processes, and normalizations to its unified format. The knowledge, information, algorithms and processes which Defendant SAMBA claims are highly accurate, valuable and proprietary.

80.    For Plaintiff, the furnished AVD Codes: DB21, DA06 and AA01 were inaccurate and ultimately assisted in the circulation of inaccurate and misleading information.

81.    More specifically, Defendant SAMBA also claims that its AVD Codes:

"are far more complex and specific than the ACD codes and convey much more information to its customers. For example, whereas the current version of ACD codes contains about 260 unique codes, [Defendant] SAMBA's AVD codes contains nearly three times more. The SAMBA Platform contains logic to map each of the tens of thousands of possible violations or notations in a driving record to its own proprietary code set. [Defendant] SAMBA has developed, improved, and refined its AVD code set over the past fifteen years through its own research and knowledge of each jurisdiction's universe of violations and license information.

[Defendant] SAMBA's AVD code set enables its customers to match and correlate violations and license information across jurisdictions in a highly specific and granular way."

82.    Defendant SAMBA claims that it "places an AVD code for each violation in an output record, which serves as a type of key to map that violation to a uniform categorization, from which a customer can determine the severity of a violation and compare severity across jurisdictions even when those jurisdictions have vastly different laws and violations."

83.    Despite Defendant SAMBA identifying itself as leading data provider, its "logic" and AVD Codes played a role in the publication of false and materially misleading information regarding Plaintiff.

**Defendant HireRight Ignores Information in Its Own File**

84.    Defendant HireRight took the so-called "Motor Vehicle Report" information from Defendant SAMBA, together with its own information regarding Ms. Moulvi's criminal, education, and employment history and the professional references, consolidated it, repackaged it and compiled the information into "the Report".

85.    On August 7, 2018, Defendant HireRight published the Report to Plaintiff's potential employer Iron Bow without any effort at reconciling the conflicts that its investigation found no record of any kind in Franklin County, OH or Fairfax County, VA from the actual court records. HireRight failed to review Defendant SAMBA's falsified convictions for "False Affidavit" and "Fraud App for Lic-Misdemeanor."

86.    Defendant HireRight's reporting misled Iron Bow to believe that Plaintiff intentionally lied or mislead her potential employer as she had indicated that she had no criminal history.

87.    Because of this, on August 16, 2018, the Human Relations Department Manager asked Ms. Moulvi why her record showed:

a.    A "Violation" or Conviction of "FRAUD APP FOR LIC – MISDEMEANOR" on September 24, 2014 for a "Violation" that had occurred on April 6, 2014 in an unspecified jurisdiction according to an unnamed source; and

b.    A "Violation" for "REVOCATION – FALSE AFFIDAVIT" with a "Conviction/End Date" of September 23, 2018 that had occurred on October 9, 2014 in an unspecified jurisdiction according to an unnamed source.

88.    The Report also showed Ms. Moulvi had "Violations" arising out of accidents on May 16, 2015 and September 1, 2016 in Fairfax County according to an unnamed source.

89.    Plaintiff was never charged or convicted of submitting false paper work to anyone, never convicted of submitting a fraudulent driver's license applications, or charged with two offenses on two separate dates.

90.    HireRight furnished grossly inaccurate information. Not only was Plaintiff not convicted of any offenses listed in the Report, but all of the Ohio Offenses were dismissed or expunged.

91.    As a result, Plaintiff suffered from anxiety and difficulty sleeping.

92.    Moreover, she specifically took actions to ensure that the Ohio Offenses of which she was never convicted, or the simple "Disorderly Conduct" charge of which she was convicted, would not be reported on criminal background checks because they were expunged years earlier.

93.    Ms. Moulvi feared that her job offer would be rescinded.  She was now in a position where her potential employer not only believed that she had been found guilty of submitting a false

affidavit and committing fraud - both crimes involving dishonesty and moral turpitude - but also

that she had now, in 2020, lied to them about it.

94.    Ms. Moulvi explained the inaccurate reporting to Iron Bow, detailing that the

charges were expunged, and provided the expungement paperwork.

95.    After considerable effort and the above referenced emotional distress, Plaintiff was

ultimately able to convince Iron Bow that 1) the charges reported about her by Defendants

HireRight and SAMBA were completely false, and 2) that the only charge that she had plead guilty

to - Disorderly Conduct - had since been expunged because an Ohio Judge had determined that

she had been rehabilitated and that she was deserving of a clean slate.

96.    However, Ms. Moulvi continues to suffer from anxiety and worry about the

possibility that these records will continue to appear if she applies for a new job or during a future

security clearance process. Therefore, she brings this action, not only to recover the damages that

she has incurred as a result of the Defendants' violations of the law, but to ensure that the VA DMV

will not publish these false records to anyone else in the future.

## COUNT I – FAIR CREDIT REPORTING ACT
### 15 U.S.C. § 1681e(b)
### Plaintiff's Class Claim Against HireRight

97.    Plaintiff restates each of the allegations in the preceding paragraphs as if set forth

at length herein.

98.    Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiff brings this

action for herself and on behalf of a class (the "HireRight Class") defined as follows:

> All natural persons residing in the United States (a) who were the subject of a report
> sold by Defendant HireRight; (b) in the five years predating the filing of this
> Complaint and continuing through the date which the class list is prepared; (c)
> which contained a Motor Vehicle Record received from SAMBA indicating a
> criminal conviction; (d) where HireRight's own database did not show such a
> criminal record, and (e.) where there was not a corresponding criminal record

conviction from the courthouse where the criminal conviction was reported to have been entered.

Excluded from the class definition are any employees, officers, directors of HireRight, any attorney appearing in this case, and any person employed by the Federal Judiciary.

99.     Numerosity. Fed. R. Civ. P 23(a)(1). Plaintiff estimates that the class is so numerous that joinder of all members is impractical. The class members' names and addresses are identifiable through documents maintained by Defendant HireRight and the class members may be notified of the pendency of this action by published and/or mailed notice.

100.    Predominance of Common Questions of Law and Fact. Fed. R. Civ. P. 23(a)(2). Common questions of law and fact exist as to all putative class members, and there are no factual or legal issues that differ between the putative class members. These common questions predominate over the questions affecting only individual class members. The common questions include: (1.) whether HireRight's failure to check the criminal record information that it received from Samba was accurate; (2.) whether HireRight's conduct constituted a violation of the FCRA; and (3.) whether HireRight's conduct was willful.

101.    Typicality. Fed. R. Civ. P. 23(a)(3). Plaintiff's claims are typical of the claims of each putative class member. Plaintiff is entitled to relief under the same causes of action as the other putative class members. Additionally, Plaintiff's claims are based on the same facts and legal theories as each of the class members' claims.

102.    Adequacy of Representation. Fed. R. Civ. P. 23(a)(4). Plaintiff is an adequate representative of the putative class because her interests coincide with, and are not antagonistic to, the interests of the other putative class members. Plaintiff has retained counsel competent and experienced in such litigation and intends, with her counsel, to continue to prosecute the action vigorously. Plaintiff and her counsel will fairly and adequately protect the class members'

interests. Neither Plaintiff nor her counsel have any interest that might conflict with her vigorous pursuit of this action.

103.    Superiority. Fed. R. Civ. P. 23(b)(3). Questions of law and fact common to the class members predominate over questions affecting only individual members, and a class action is superior to other available methods for fair and efficient adjudication of the controversy. The damages sought by each class member are such that individual prosecution would prove burdensome and expensive. It would be virtually impossible for individual class members to effectively redress the wrongs done to them. Even if the class members could afford individual litigation, it would be an unnecessary burden on the courts. Furthermore, individualized litigation presents a potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and to the court system presented by the legal and factual issues raised by Defendant HireRight's conduct. By contrast, the class-action device will result in substantial benefits to the litigants and the Court by allowing the Court to resolve numerous individual claims based upon a single set of proof in a case.

104.    As described above, Defendant HireRight republished the criminal conviction information that it received from Defendant SAMBA in the VA DMV reports without checking to make sure that there was a corresponding public record from the courthouse where the conviction was allegedly entered.

105.    This conduct violated § 1681e(b) of the FCRA because in failing to implement this common-sense safeguard, Defendant HireRight failed to follow reasonable procedures to assure the maximum possible accuracy of the information it that it published about consumers to its clients.

106.    Plaintiff and each putative class member suffered real and actual harm and injury.

107.    For example, the rights at issue were determined by Congress to be important measures to ensure continued accuracy and completeness in Defendant HireRight's files and reports.

108.    Class members also had a potential inaccurate criminal history published to their potential employers.

109.    Defendant HireRight's conduct was willful, rendering it liable for statutory and punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n. In the alternative, the violation was negligent, rendering Defendant HireRight liable under 15 U.S.C. § 1681o.

110.    As a result of these FCRA violations, Defendant HireRight is liable for statutory damages from $100.00 to $1,000.00 for Plaintiff and each class member, punitive damages, attorney's fees, and costs pursuant to 15 U.S.C. § 1681n.

## COUNT II – FAIR CREDIT REPORTING ACT
### 15 U.S.C. § 1681e(b)
### Plaintiff's Class Claim Against SAMBA
### Reporting records that have been Sealed, Expunged, Pardoned, or are otherwise no longer publicly accessible convictions

111.    Plaintiff restates each of the allegations in the preceding paragraphs as if set forth at length herein.

112.    Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiff brings this action for herself and on behalf of a class (the "SAMBA e(b) Sealed Record Class") defined as follows:

> All natural persons residing in the United States (a) who were the subject of a report sold by Defendant SAMBA; (b) in the five years predating the filing of this Complaint and continuing through the date which the class list is prepared; (c) which contained a Motor Vehicle Record received from SAMBA including a

criminal record; (d) when the criminal record is not publicly accessible, by seal, expungement or other basis, within 60 days before the date of the subject report. Excluded from the class definition are any employees, officers, directors of Defendant SAMBA, any attorney appearing in this case, and any person employed by the Federal Judiciary.

113.    Plaintiff also pleads a subclass limited SAMABA e(b) Class Members who have been the subject of a § 2953.32 Order as to charges SAMBA reported after the date such order was entered. (The "§ 2953.32 Subclass").

114.    Numerosity. Fed. R. Civ. P 23(a)(1). Plaintiff estimates that the class is so numerous that joinder of all members is impractical. The class members' names and addresses are identifiable through documents maintained by Defendant SAMBA and the class members may be notified of the pendency of this action by published and/or mailed notice.

115.    Predominance of Common Questions of Law and Fact. Fed. R. Civ. P. 23(a)(2). Common questions of law and fact exist as to all putative class members, and there are no factual or legal issues that differ between the putative class members. These common questions predominate over the questions affecting only individual class members. The common questions include: (1.) whether Defendant SAMBA's reporting of criminal records accurately reflects the current status of the record, (2.) whether Defendant SAMBA's conduct constituted a violation of the FCRA; and (3.) whether Defendant SAMBA's conduct was willful.

116.    Typicality. Fed. R. Civ. P. 23(a)(3). Plaintiff's claims are typical of the claims of each putative class member. Plaintiff is entitled to relief under the same causes of action as the other putative class members. Additionally, Plaintiff's claims are based on the same facts and legal theories as each of the class members' claims.

117.    Adequacy of Representation. Fed. R. Civ. P. 23(a)(4). Plaintiff is an adequate representative of the putative class because her interests coincide with, and are not antagonistic to,

the interests of the other putative class members. Plaintiff has retained counsel competent and experienced in such litigation and intends, with her counsel, to continue to prosecute the action vigorously. Plaintiff and her counsel will fairly and adequately protect the class members' interests. Neither Plaintiff nor her counsel have any interest that might conflict with her vigorous pursuit of this action.

118.    Superiority. Fed. R. Civ. P. 23(b)(3). Questions of law and fact common to the class members predominate over questions affecting only individual members, and a class action is superior to other available methods for fair and efficient adjudication of the controversy. The damages sought by each class member are such that individual prosecution would prove burdensome and expensive. It would be virtually impossible for individual class members to effectively redress the wrongs done to them. Even if the class members could afford individual litigation, it would be an unnecessary burden on the courts. Furthermore, individualized litigation presents a potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and to the court system presented by the legal and factual issues raised by HireRight's conduct. By contrast, the class-action device will result in substantial benefits to the litigants and the Court by allowing the Court to resolve numerous individual claims based upon a single set of proof in a case.

119.    As described above, Defendant SAMBA has no reasonable procedure to prevent it from providing criminal record information that are not in fact still reporting as convictions by the respective court.

120.    This conduct violated § 1681e(b) of the FCRA because by reporting expunged information and recoding the data that it received from DMVs, SAMBA failed to follow

reasonable procedures to assure the maximum possible accuracy of the information it that it published about consumers to its clients.

121.    Plaintiff and each putative class member suffered real and actual harm and injury.

122.    For example, the rights at issue were determined by Congress to be important measures to ensure continued accuracy and completeness in SAMBA's files and reports.

123.    Class members also had a potential inaccurate criminal history published to their potential employers.

124.    SAMBA's conduct was willful, rendering it liable for statutory and punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n. In the alternative, the violation was negligent, rendering SAMBA liable under 15 U.S.C. § 1681o.

125.    As a result of these FCRA violations, SAMBA is liable for statutory damages from $100.00 to $1,000.00 for Plaintiff and each class member, punitive damages, attorney's fees, and costs pursuant to 15 U.S.C. § 1681n.

## COUNT III – FAIR CREDIT REPORTING ACT
### 15 U.S.C. § 1681e(b)
### Plaintiff's Class Claim Against SAMBA
### Inaccurately replacing ACD Codes

126.    Plaintiff restates each of the allegations in the preceding paragraphs as if set forth at length herein.

127.    Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiff brings this action for herself and on behalf of a class (the "SAMBA e(b) ACD Class") defined as follows:

> All natural persons residing in the United States (a) who were the subject of a report sold by Defendant SAMBA; (b) in the five years predating the filing of this Complaint and continuing through the date which the class list is prepared; (c) which contained a Motor Vehicle Record received from SAMBA; (d) where SAMBA's assigned private code was inconsistent with the motor vehicle agency assigned AAMVA Code.

Excluded from the class definition are any employees, officers, directors of Defendant SAMBA, any attorney appearing in this case, and any person employed by the Federal Judiciary.

128.    Plaintiff also pleads a subclass limited SAMABA e(b) ACD Class Members for whom the SAMABA reported record was obtained from the VA DMV. (The "VA DMV SAMBA Subclass").

129.    Numerosity. Fed. R. Civ. P 23(a)(1). Plaintiff estimates that the class is so numerous that joinder of all members is impractical. The class members' names and addresses are identifiable through documents maintained by Defendant SAMBA and the class members may be notified of the pendency of this action by published and/or mailed notice.

130.    Predominance of Common Questions of Law and Fact. Fed. R. Civ. P. 23(a)(2). Common questions of law and fact exist as to all putative class members, and there are no factual or legal issues that differ between the putative class members. These common questions predominate over the questions affecting only individual class members. The common questions include: (1.) whether Defendant recoding of the information that it obtained from the VA DMV was accurate; (2.) whether Defendant SAMBA's conduct constituted a violation of the FCRA; and (3.) whether Defendant SAMBA's conduct was willful.

131.    Typicality. Fed. R. Civ. P. 23(a)(3). Plaintiff's claims are typical of the claims of each putative class member. Plaintiff is entitled to relief under the same causes of action as the other putative class members. Additionally, Plaintiff's claims are based on the same facts and legal theories as each of the class members' claims.

132.    Adequacy of Representation. Fed. R. Civ. P. 23(a)(4). Plaintiff is an adequate representative of the putative class because her interests coincide with, and are not antagonistic to, the interests of the other putative class members. Plaintiff has retained counsel competent and

experienced in such litigation and intends, with her counsel, to continue to prosecute the action vigorously. Plaintiff and her counsel will fairly and adequately protect the class members' interests. Neither Plaintiff nor her counsel have any interest that might conflict with her vigorous pursuit of this action.

133.    Superiority. Fed. R. Civ. P. 23(b)(3). Questions of law and fact common to the class members predominate over questions affecting only individual members, and a class action is superior to other available methods for fair and efficient adjudication of the controversy. The damages sought by each class member are such that individual prosecution would prove burdensome and expensive. It would be virtually impossible for individual class members to effectively redress the wrongs done to them. Even if the class members could afford individual litigation, it would be an unnecessary burden on the courts. Furthermore, individualized litigation presents a potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and to the court system presented by the legal and factual issues raised by HireRight's conduct. By contrast, the class-action device will result in substantial benefits to the litigants and the Court by allowing the Court to resolve numerous individual claims based upon a single set of proof in a case.

134.    Defendant SAMBA uses various ACD codes to reclassify offenses after receiving the assigned coding from the DMV source, which results in certain offenses being mistakenly classified as driving related or more serious offenses.

135.    SAMBA failed to follow reasonable procedures to assure the maximum possible accuracy of the information it that it published about consumers to its clients.

136.    Plaintiff and each putative class member suffered real and actual harm and injury.

137.    For example, the rights at issue were determined by Congress to be important measures to ensure continued accuracy and completeness in SAMBA's files and reports.

138.    Class members also had a potential inaccurate criminal history published to their potential employers.

139.    SAMBA's conduct was willful, rendering it liable for statutory and punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n. In the alternative, the violation was negligent, rendering SAMBA liable under 15 U.S.C. § 1681o.

140.    As a result of these FCRA violations, SAMBA is liable for statutory damages from $100.00 to $1,000.00 for Plaintiff and each class member, punitive damages, attorney's fees, and costs pursuant to 15 U.S.C. § 1681n.

**COUNT IV – DRIVER PRIVACY PROTECTION ACT OF 1994**
**18 U.S.C. § 2724**
**Plaintiff's Individual Claim Against SAMBA**

141.    Plaintiff restates each of the allegations in the preceding paragraphs as if set forth at length herein.

142.    Defendant SAMBA violated 18 U.S.C. § 2724 by obtaining, disclosing, and using the Plaintiff's personal information from her motor vehicle record without a permissible purpose under the Driver Privacy Protection Act.

143.    As a result of Defendant SAMBA's conduct, Plaintiff suffered concrete and particularized harm, including without limitation: delay of her employment application, damage to reputation, embarrassment, humiliation, and other emotional distress.

144.    Defendant SAMBA's conduct in violating 18 U.S.C. § 2724 was willful or constituted a reckless disregard for the law, rendering it liable to Plaintiff for punitive damages.

145.    Plaintiff is entitled to recover her actual damages or liquated damages not less than $2,500, punitive damages, her reasonable attorney's fees and costs, and any other preliminary or equitable relief that the court determines to be appropriate.

## COUNT V – DECLARATORY JUDGMENT
### 28 U.S.C. § 2201
### Plaintiff's Individual Claim Against VA DMV

146.    Plaintiff restates each of the allegations in the preceding paragraphs as if set forth at length herein.

147.    The information that the VA DMV furnished and sold to SAMBA was furnished without a legal basis under Virginia law.

148.    On information and belief, VA DMV itself has incorrectly included the Ohio Offenses within its database even though these were not and were never offenses related to the operation of a motor vehicle.

149.    Plaintiff is facing future harm as a result of the VA DMV's actions, including the potential publication of another false employment report about her to a potential employer.

150.    This dispute and controversy is a justiciable matter that is not speculative, and a resolution by this Court will determine the rights and interests of the parties with respect to validity of the records that the VA DMV sold about the Plaintiff.

151.    Pursuant to 28 U.S.C. § 2201, there is an actual justiciable controversy, and a declaratory judgment is the appropriate mechanism for resolving the validity of the Plaintiff's dispute with the VA DMV.

152.    Accordingly, Plaintiff seeks a declaratory judgment that the "Driver Record Information" report sold about her by the VA DMV on August 3, 2018 was provided to Defendant Safety Holdings in violation of Virginia law; and for injunctive relief to enjoin it from (a.)

including records from other jurisdictions that are not related to convictions relating to her use of

a motor vehicle when it furnishes "Driving Record Information" reports about her in the future,

and (b.) that such information only be furnished about her when the position that she is being

considered for involves the operation of a motor vehicle as required by Virginia Code § 46.2-

208(B)(11).

WHEREFORE, Plaintiff, on behalf of herself and the putative class members, moves for

class certification and for statutory and punitive damages, as well as her attorney's fees and costs

against the Defendants for the class claim, as well as actual, statutory, and punitive damages and

attorney's fees and costs for her individual claim; for pre-judgment and post-judgment interest at

the legal rate, and such other relief the Court does deem just, equitable, and proper.

**TRIAL BY JURY IS DEMANDED.**

Respectfully submitted,
**TASMIA MOULVI,**

By:

_____*/s/ Leonard A. Bennett*_____
Leonard A. Bennett, VSB# 37523
Craig C. Marchiando, VSB# 89736
CONSUMER LITIGATION ASSOCIATES, P.C.
763 J. Clyde Morris Blvd., Suite 1-A
Newport News, VA 23601
Telephone: (757) 930-3660
Facsimile: (757) 930-3662
Email: lenbennett@clalegal.com
Email: craig@clalegal.com

Matthew James Erausquin
CONSUMER LITIGATION ASSOCIATES, P.C.
1800 Diagonal Road, Suite 600
Alexandria, VA 22314
Telephone: 703-273-7770
Facsimile: 888-892-3512
Email: matt@clalegal.com

Kristi C. Kelly, VSB #72791
Andrew J. Guzzo, VSB #82170
Casey Nash, VSB #84261
KELLY GUZZO, PLC
3925 Chain Bridge Road, Suite 202
Fairfax, VA 22030
Telephone: (703) 424-7572
Facsimile: (703) 591-0167
Email: kkelly@kellyguzzo.com
Email: aguzzo@kellyguzzo.com
Email: casey@kellyguzzo.com

Scott A. Surovell, Esquire, VSB #40278
SUROVELL ISAACS & LEVY PLC
4010 University Drive, Suite 200
Fairfax, VA 22030
Telephone: (703) 277-9750
Facsimile: (703) 591-9285
E-mail: SSurovell@SurovellFirm.com

*Counsel for Plaintiff*